**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| **M.D. ON-LINE, INC.,** | 05-CV-4081 (WJM) |
| **Plaintiff,** | |
| **v.** | **OPINION** |
| **WebMD CORPORATION, t/a EMDEON CORPORATION, EMDEON BUSINESS SERVICES, and EMDEON PRACTICE SERVICES,** | |
| **Defendants.** | |

Jonathan D. Clemente
Clemente, Mueller & Tobia, P.A.
P.O. Box 1296
Morristown, New Jersey 07962-1296

Sean D. Garrison
Jennifer Anne Van Kirk
Shane E. Olafson
Lewis and Roca, LLP
40 North Central Avenue
Phoenix, Arizona  85004-4429
*Attorneys for Plaintiff*

David J. Sheehan
James M. Lee
E. Evans Wohlforth
Gibbons, Del Deo, Dolan,
  Griffinger & Vecchione
A Professional Corporation
One Riverfront Plaza
Newark, New Jersey  07102-5497

Pasquale A. Razzano
Nina Shreve
James M. Gibson
Fitzpatrick, Cella, Harper & Scinto

30 Rockefeller Plaza
New York, New York 10112-3800
*Attorneys for Defendants*

**MARTINI, U.S.D.J.:**

This matter comes before the Court on plaintiff M.D. On-Line, Inc.'s ("M.D. On-Line's") motion for a preliminary injunction to enjoin defendants from using the service mark "emdeon." Plaintiff's mark "M.D. ON-LINE" is a federally registered service mark for the field of "electronic data submission services required for electronic processing of claims in the healthcare industry." (Compl. Ex. A). Plaintiff alleges that defendants use of the "emdeon" mark in the healthcare industry violates federal and state trademark law, constitutes unfair competition under federal and state law, and is causing it irreparable harm. For the reasons set forth below, plaintiff's motion for preliminary injunction is **DENIED**.

## BACKGROUND

Plaintiff provides software solutions for healthcare providers. Its three software packages, WebLINK, WinLINK and ClaimLink 1500, allow healthcare providers to "electronically submit claims to insurance companies for payment." (Compl. ¶ 1). Its software also allows healthcare providers to verify electronically in real-time the "eligibility of insurance coverage when patients seek healthcare services from providers." (Compl. ¶ 17).

Defendants, formerly known as WebMD, now trading as some variation of Emdeon, perform many services and provide many products to the healthcare industry. Emdeon Corporation ("Emdeon") is the parent company; it is composed of four business units: Emdeon Business Services, Emdeon Practice Services, WebMD Health, and Porex. Emdeon's core

2

businesses are dedicated to electronically connecting "healthcare providers, payers, employers, physicians, and patients, to simplify the healthcare business process, to provide needed information at the right time and place, and to improve healthcare quality." (Defs.' Opp'n Br. at 2). Emdeon provides the "largest single electronic clearinghouse for healthcare claims in the U.S." (Compl. ¶ 3). Emdeon processes the electronic claims submitted by providers and from intermediaries such as M.D. On-Line. (*Id.*). Currently, plaintiff and Emdeon have a contractual relationship whereby plaintiff processes claims through Emdeon's clearinghouse and Emdeon provides plaintiff with rebates for those transactions based on volume. (*Id.* at ¶ 30). This relationship accounted for approximately 40% of plaintiff's revenue in 2004. (Defs.' Opp'n Br. at 5).

Emdeon Business Services ("EBS") is the business entity that competes directly with plaintiff. (*Id.* at 5). EBS "offers healthcare providers reimbursement services, allowing them to interact electronically with healthcare payers." (*Id.* at 3). EBS sells only one product that competes with plaintiff's products – WebMD Office. (*Id.* at 5). It is the marketing and advertising of that product under the emdeon mark that lead plaintiff to file suit and seek an injunction.

## ANALYSIS

A preliminary injunction is an extraordinary form of relief that should be granted in limited circumstances. *NutraSweet Co. v. Vit-Mar Enters., Inc.*, 176 F.3d 151, 153 (3d Cir. 1999). A preliminary injunction should issue only when the moving party establishes each of the following four factors: (1) that the moving party has a reasonable probability of success on the

3

merits; (2) that the moving party will be irreparably harmed if denied relief; (3) that the non-moving party will not be harmed to a greater extent if relief is granted; and (4) granting preliminary relief will be in the public interest.  *Id.*  If the moving party is unable to show *any* of those factors, preliminary relief should be denied.  *Id.*

## I.     Likelihood of Success on the Merits

In order to show a reasonable probability of success on the merits, "the burden is on the party seeking relief to make a *prima facie* case showing a reasonable probability that it will prevail on the merits" of the claim.  *Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir. 1975).  "To prevail on a claim for trademark infringement or unfair competition under the Lanham Act, the owner of a valid and legally protectable mark . . . must show that a defendant's use of a similar mark for its goods 'causes a likelihood of confusion.'" *Kos Pharms., Inc. v. Andrx Corp.*, 369 F.3d 700, 708-09 (3d Cir. 2004).

The Third Circuit has devised a nonexclusive list of factors, referred to as the *Lapp* factors,[1] that the Court must consider when analyzing likelihood of confusion.  These factors are:

> (1) the degree of similarity between the owner's mark and the alleged infringing mark;
>
> (2) the strength of the owner's mark;
>
> (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase;
>
> (4) the length of time the defendant has used the mark without evidence of actual confusion arising;

---

[1]*See Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 463 (3d Cir. 1983).

4

(5) the intent of the defendant in adopting the mark;

(6) the evidence of actual confusion;

(7) whether the goods, competing or not competing, are marketed through the same channels of trade and advertised through the same media;

(8) the extent to which the targets of the parties' sales efforts are the same;

(9) the relationship of the goods in the minds of consumers, whether because of the near-identity of the products, the similarity of function, or other factors;

(10) other facts suggesting that the consuming public might expect the prior owner to manufacture both products, or expect the prior owner to manufacture a product in the defendant's market, or expect that the prior owner is likely to expand into the defendant's market.

*Kos Pharms.*, 369 F.3d at 709 (quoting *A & H Sportswear, Inc. v. Victoria's Secret Stores, Inc.*, 237 F.3d 198, 215 (3d Cir. 2000)).  None of these factors alone determines whether there is a likelihood of confusion.  Rather, the Court must consider all of these factors and give them the weight appropriate under the particular circumstances before the Court.  *Id.*

Plaintiff argues that it is likely to succeed at trial because its M.D. ON-LINE mark is valid and legally enforceable, and defendant's use of the emdeon mark is likely to cause confusion.  Defendants respond by arguing that plaintiff's mark is not enforceable, and even if it is, there is no likelihood of confusion between the marks M.D. ON-LINE and emdeon.  The fact that M.D. ON-LINE is a federally registered mark, see Fed. Reg. No. 2,274,698, constitutes *prima facie* evidence of the mark's validity.  *See* 15 U.S.C. § 1115(a).  Thus, for purposes of this

5

motion, the Court will assume plaintiff's mark is valid and enforceable.  As a result, in order to resolve this dispute, the Court must weigh and balance the *Lapp* factors.

### 1.    Degree of Similarity Between the Marks

"The single most important factor in determining likelihood of confusion is mark similarity."  *A & H*, 237 F.3d at 216.  Marks "are confusingly similar if ordinary consumers would likely conclude that [the two products] share a common source, affiliation, connection or sponsorship."  *Fisons Horticulture, Inc. v. Vigoro Indus., Inc.*, 30 F.3d 466, 477 (3d Cir. 1994).  The proper test is "not side-by-side comparison" but "whether the labels create the 'same overall impression' when viewed separately."  *Id.* (quoting *Banff, Ltd. v. Federated Dep't Stores, Inc.*, 841 F.2d 486, 492 (2d Cir. 1988)).  Courts should "compare the appearance, sound, and meaning of the marks" in assessing their similarity.  *Kos Pharms.*, 369 F.3d at 713.

The Court finds there is no similarity in appearance between "M.D. ON-LINE" and "emdeon".  Indeed, they are visually distinct.  Plaintiff's mark is two words, including two periods and one hyphen; defendant's mark is one word without punctuation.  They are spelled differently.  They differ in length (six versus eight letters).  They begin and end with different letters.  M.D. ON-LINE consists of all uppercase letters, emdeon contains none.  Further, M.D. ON-LINE often appears on two separate lines, M.D. over ON-LINE, whereas emdeon does not.

The Court finds that the two marks do not have a similar meaning.  M.D. ON-LINE describes a service involving doctors on the internet.  Emdeon is a fanciful term that has no apparent meaning.  Plaintiff argues that emdeon has a similar meaning, relying in part on a script that was generated for WebMD Business Services.  In that script, Emdeon states that its new

6

name "suggests a grounding in e-healthcare."  (O'Sullivan Cert. at Ex. A).  However, that script

is inapposite.  First, the script details a branding effort by Emdeon in which it seeks to imbue a

certain meaning into the otherwise meaningless term "Emdeon."  Second, plaintiff takes the

quote out of context in order to establish some small degree of similarity.  When the meaning

suggested by the script is looked at as a whole, there could be no confusion between the two

marks:

> Our new name, Emdeon, references our history as WebMD and
> formerly, Healtheon.  It also suggests a grounding in e-healthcare
> and denotes a solid organization focused on improving healthcare
> and exceeding the expectations of its business partners.

(*Id.*).

Plaintiff essentially argues that any differences in appearance and meaning should be

trumped by the marks' phonetic similarity.  Plaintiff bases this argument on the fact that the

allegedly most significant form of marketing performed by the parties is telemarketing.  Plaintiff

also argues that word-of-mouth is critical to its products' success.  However, in making these

arguments, plaintiff appears to ignore the commercial reality of how these software products are

marketed.  There is no dispute that plaintiff's LINK products, as well as defendant's WebMD

Office, are used only over the internet, no physical documentation is involved.  Therefore, in

order to market these products, the parties would need to provide the website address from which

customers could read about, and potentially register to use their products.[2]  Thus, the appearance

---

[2]It is worth noting that the Uniform Resource Locators ("URL's") for their websites are
distinct: www.mdon-line.com versus www.emdeon.com.

of the marks plays a role in the commercial setting, thereby greatly diminishing the affect that sound alone may have on consumers.

Furthermore, the Court disagrees with plaintiff's underlying premise that the marks are confusingly similar.  Although plaintiff is correct that the first three syllables of each mark are pronounced similarly, by focusing on only the first three syllables, plaintiff takes its whole mark out of context.  *See Kos Pharms.*, 369 F.3d at 713 ("But the proper legal test is not whether there is some confusing similarity between sub-parts of the marks; the overarching question is whether the marks, '*viewed in their entirety*,' are confusingly similar.") (emphasis in original) (quoting *A & H*, 237 F.3d at 216).  Its mark is M.D. ON-LINE, not "M.D. ON".  When the marks are heard in their entirety, they are not confusingly similar.  Plaintiff's mark contains four syllables, emdeon contains only three.  M.D. ON-LINE is spoken as two separate letters and a two syllable word, whereas emdeon is spoken as one word.  Significantly, the fourth syllable of plaintiff's mark – the word "LINE" – makes plaintiff's mark end in a different sound.  The Court believes that that different sound makes the two marks sound dissimilar.

In short, when the marks are viewed in their entirety in the proper commercial setting, this factor favors defendants.

### 2.      Strength of the Owner's Mark

A Court must consider both the conceptual and commercial strength of the owner's mark. *Kos Pharms.*, 369 F.3d at 715.  The conceptual strength of a mark looks to its inherent features. *A & H*, 273 F.3d at 221.  Marks are classified into four categories of descending conceptual strength:  (1) arbitrary or fanciful; (2) suggestive; (3) descriptive; and (4) generic. *Id.*  Arbitrary

and fanciful marks are the strongest marks entitled to the greatest protection; generic marks are the weakest marks entitled to no protection.

The Court believes that M.D. ON-LINE is either a descriptive or suggestive mark.  M.D. ON-LINE is descriptive to the extent that it refers to products that place medical doctors on-line. *See J & J Snack Foods Corp. v. Nestle USA, Inc.*, 149 F. Supp. 2d 139, 147 (D.N.J. 2001) (A descriptive mark describes "the purpose, function or use of the product, a desirable characteristic of the product, or the nature of the product.").  The mark is suggestive to the extent it takes some imagination to determine that M.D. ON-LINE provides software for electronically processing medical doctors' claims over the internet.  *See A & H*, 237 F.3d at 221-22 (suggestive marks require the consumer to exercise "imagination, thought, or perception" to ascertain the nature of the product or service).  In any event, plaintiff's mark is conceptually weak because of the ubiquity of its constituents.  There is no dispute that "M.D." is a term widely used in the healthcare field to refer to medical doctors.  (*See* Pl.'s Reply Br. at 6).  Nor is there any dispute that "on-line" is a term widely used to describe products offered over the internet.  (*See id.*).  That being the case, consumers are less likely to assume that products made by a similar mark came from the same source.  *See A & H*, 237 F.3d at 223 (stating that extensive use of a term, even in other markets, may have a "weakening effect on the strength of the mark").

The marketplace recognition of a mark determines its commercial strength.  *A & H*, 237 F.3d at 221.  The evidence appears to demonstrate that plaintiff's mark has moderate commercial strength.  Plaintiff has used the name M.D. ON-LINE in the same industry for over ten years, including the mark on all company advertising and promotional materials during that time period.  The mark is featured on its website, as well as on co-branded websites, i.e., websites of

other companies that promote M.D. On-Line's products.  (Compl. ¶ 24; Bartzak Cert. ¶¶ 16-17).

Mr. Patrick Kennedy, a consultant for plaintiff who specializes in the field of electronic

communications between healthcare payers and providers and has over twenty years of

experience in the field, certified that plaintiff is positively and widely recognized by healthcare

payers throughout the country for providing electronic claim submission products and services.

(Kennedy Cert. ¶¶ 1-2, 8-9).  Although plaintiff allegedly "spends an enormous portion of its

annual budget developing and promoting its products and services offered under the M.D.ON-

LINE® mark",[3] plaintiff did not submit evidence demonstrating how much it spends on

marketing and advertising.  That lack of evidence, however, does not undercut the other evidence

before the Court.

   In sum, because plaintiff's mark has weak conceptual strength and moderate commercial

strength, the Court finds that this factor slightly favors plaintiff.


   **3.      Factors Indicative of the Care and Attention Expected of Consumers**

   This factor "weighs against finding a likelihood of confusion '[w]hen consumers exercise

heightened care in evaluating the relevant products before making purchasing decisions.'" *Kos

Pharms.*, 369 F.3d at 715 (quoting *Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.*,

269 F.3d 270, 284 (3d Cir. 2001)).  The parties consider the consumers to be healthcare providers

and payers who use the internet to process their claims.  (*See* Pl.'s Br. at 6; Defs.' Opp'n Br. at

21).  More specifically, they appear to be the "office  manager" or "billing administrator" in the

doctor's office who uses a particular piece of software to process patients' claims.  (*See, e.g.*,

---

[3](Compl. ¶ 23).

Sept. 22, 2005 Hearing Tr. ("Tr.") at 16:17-20). Plaintiff acknowledges that the consumers are "arguably sophisticated." (Pl.'s Br. at 13). Plaintiff's President and CEO agreed in his deposition that the selection of an electronic billing service by an officer manager is probably one of the more important tasks that person performs. (*See* Bartzak Dep. at 73-74). He also agreed that the officer manager would exercise some amount of due diligence in performing that task. (*See id.*). Therefore, the Court finds that the relevant consumers are knowledgeable professionals – office managers or billing administrators – who would exercise heightened care before selecting an electronic claims processing service. (*See* Tr. at 43:11-16 (acknowledging that the relevant universe of consumers is a "sophisticated group")); *see also Checkpoint*, 269 F.3d at 285 ("Many cases state that where the relevant buyer is composed of professionals or commercial buyers familiar with the field, they are sophisticated enough not to be confused.").

Plaintiff argues that defendants have a "well-known history of growth through acquisition of competitors",[4] which would likely lead consumers to believe that Emdeon acquired plaintiff. However, this argument is unsubstantiated and, therefore, without any merit.

Accordingly, this factor favors defendants.


### 4./6.    Length of Time Defendants' Mark Has Been Used Without Confusion / Evidence of Actual Confusion

With regard to the fourth factor, the parties' "concurrent use of 'similar marks for a sufficient period of time without evidence of consumer confusion about the source of the products' allows 'an inference that future consumers will not be confused either.'" *Kos Pharms.*,

_____

[4](Pl.'s Br. at 14).

369 F.3d at 717 (quoting *Fisons*, 30 F.3d at 476).  Factor six considers evidence of actual confusion.  *Id.*

Defendants began using their emdeon mark on August 4, 2005.  (*See* Defs.' Br. at 7).  As a result, the parties have used the marks concurrently for approximately two months.  This amount of time appears to be too small to drawn any meaningful inferences regarding whether the marks are confusingly similar.

Moreover, there is no evidence of actual confusion.  Plaintiff claims that after defendants publicly announced the name change in August, "M.D. On-Line immediately began receiving communications from industry insiders inquiring about the name change and expressing their belief that confusion is likely to result."  (Pl.'s Br. at 14).  However, this argument is meritless.  Plaintiff does not identify who these "industry insiders" are, except that the Court is left with the impression that they are not consumers.  And, more importantly, the legal opinions of industry insiders, that confusion is "likely to result," are entitled to no weight.  Neither is plaintiff's self-serving and unsupported statement that "several third party payers . . . expressed concern with the confusion they believe is created by Defendant's rebranding."  (Pl.'s Br. at 8).  For purposes of actual confusion, these opinions and concerns are irrelevant.

Plaintiff also submitted a survey to show actual confusion.  The survey was conducted by Mr. Kenneth Hollander, who has conducted or critiqued a vast number of intellectual property surveys.  The survey was of 302 people who were employed by personal care physicians, their employment involved submission of medical claims to insurance companies, and the submission

12

of those claims was done or prospectively would be done over the internet.  The test group was

composed of 202 people, and the remaining 100 people composed the control group.[5]

The survey was conducted by telephone.  The interviewer began by asking the test group:

> [Question] 1.  One of the electronic claims processing companies is named (EMDEON (EM-DEE-ON) . . .).  The second company is M.D. On-line. . . .  If you have an opinion, other than the fact that they are in the same business, do you think that these two companies are associated with each other, or that they are not associated with each other?

(Pl.'s Ex. 2, Questionnaire).  If the participant answered that they are associated, he or she was

then asked, "Why do you say that?  Why else?"  (*Id.*).  Then the interviewer asked:

> [Question] 3.  And if you have an opinion, do you think that one of these companies is sponsored or endorsed by the other company, or do you think that neither company is sponsored or endorsed by the other?

(*Id.*).  If the participant answered that one company is sponsored or endorsed by the other, he or

she was asked to explain why.  Lastly, the interviewer asked:

> [Question] 5.  Finally, do you think that one of these companies had to get permission from the other company, or that neither company had to get permission from the other?

(*Id.*).  If the participant answered that one of the companies had to get permission, he or she was

asked to explain why.

---

[5]The purpose of the control group is to account for "noise," that is, any external factors that may improperly influence participants' opinions.  In order to account for noise, the survey questioned participants in the control group about the association between plaintiff's mark and a "fictitious mark, 'ProxyMed.'" (Hollander Cert., Ex. A ¶ 16).  Any confusion that the control group had would be considered noise because the comparison mark was presumably fictitious, and thus must be attributable to other factors.  However, it came to light during the hearing on plaintiff's motion that ProxyMed is not a fictitious name; it is an actual company that provides electronic claims to healthcare providers.  (*See* Tr. at 38:9-39:6).  This obviously casts tremendous doubt on the survey's ability to account for noise.

After tallying the responses and contrasting the test group with the control group,[6] Mr. Hollander estimates that approximately 25.7% of the participants expressed that they "thought that the two names . . .were affiliated or connected in some way because of their same or similar name." (Hollander Cert. ¶ 5).  However, this survey is both procedurally and substantively flawed.  First, plaintiff introduced the survey in its reply brief, not its moving brief.  This maneuver deprived the defendants of a meaningful opportunity to respond within the normal course.  As such, the Court will disregard this "newly minted" evidence.  *See Bayer AG v. Schein Pharm., Inc.*, 129 F. Supp. 2d 705, 716 (D.N.J. 2001), *aff'd*, 301 F.3d 1306 (3d Cir. 2002) (striking portions of reply brief which raised new issues for the first time).

Second, even if the Court were to consider the survey, it appears to suffer several flaws that render it unreliable, two of which the Court will address at this time.  "Survey evidence can sometimes demonstrate evidence of actual confusion but only to the extent 'that the survey mirrors the real world setting which can create an instance of actual confusion.'" *Harlem Wizards Entm't Basketball, Inc. v. NBA Properties, Inc.*, 952 F. Supp. 1084, 1098 (D.N.J. 1997) (quoting 3 J. McCarthy, McCarthy on Trademarks and Unfair Competition § 23.01[3][a])).  Here, plaintiff's survey does not mirror the "real world setting."  The marks in question identify the sources of web-based programs.  And yet, this survey was done over the telephone, participants were not shown the marks, nor were they directed to websites that contained the marks.  Thus, any alleged association the participants found between the marks was based on sound alone, and does not address how the marks might be viewed in a commercial setting.  By

---

[6]Not surprisingly, no one in the control group believed that M.D. On-Line and ProxyMed were affiliated or connected to each other.  (*See* Hollander Cert. ¶ 5).

removing the marks from their proper commercial setting, plaintiff unjustifiably skewed the results.

Moreover, it is unclear whether any association between the marks was actually based on aural similarity or due to the leading nature of the questions asked.  This Court finds Questions 1, 3 and 5 were leading questions.  As Mr. Hollander is well aware, and as he has represented to at least one other district court, the probative value of leading questions is essentially nil.  *IDV North Am., Inc. v. S & M Brands, Inc.*, 26 F. Supp. 2d 815, 830 (E.D. Va. 1998) ("[A]ccording to Mr. Hollander, the probative value of the survey is of virtually no utility on that issue because Question Numbers 7 and 10 are leading questions which invite answers that tend to suggest a likelihood of confusion where none may exist.").  Here, the questions undisputedly asked participants whether there is an association between plaintiff's mark and defendants' mark.  This line of questioning has been rejected as leading and suggestive and, therefore, improper.  *Id.* ("Thus, a question which asks survey participants whether they believe that there is a connection between the plaintiff's and defendant's goods and services has been rejected as an improper leading question which lacks probative value and which prejudices the reliability of the survey.").  Consequently, the Court concludes that plaintiff's survey is entitled to little, if any, weight.  *See Prince Mfg., Inc. v. Bard Int'l Assocs., Inc.*, No. 88-3816, 1988 WL 142407, *7-*8 (D.N.J. Dec. 22, 1988) (giving scant weight to a survey that found 39.5% confusion rate because, in part, the survey did not focus on how the mark was used on defendant's products and asked a leading question).

In short, this factor favors neither party.

15

5.      **Defendants' Intent in Adopting Mark**

Evidence that a defendant willfully adopted a mark closely similar to an existing mark "weighs strongly in favor of finding [a] likelihood of confusion." *Checkpoint*, 269 F.3d at 286. "The adequacy and care with which a defendant investigates and evaluates its proposed mark, and its knowledge of similar marks or allegations of potential confusion, are highly relevant." *Kos Pharms.*, 369 F.3d at 721.

The evidence before the Court indicates an absence of bad faith in adopting the emdeon mark.  In 2004, WebMD Corporation ("WebMD"), a publicly traded company, announced that its subsidiary, WebMD Health, was going public.  In an effort to avoid confusion in the investing public between the two companies, WebMD sought to adopt a new public identity for itself and its subsidiaries WebMD Business Services and WebMD Practice Services because it believed WebMD Health was more closely associated with the WebMD name.  WebMD then hired Landor Associates, an outside naming firm, to devise a new corporate name.  Landor Associates was not aware of plaintiff's M.D. ON-LINE mark.  Following the parameters WebMD gave them, Landor Associates, on the second attempt, offered WebMD a list of ten potential names, one of them being the name "Emdeon."  WebMD personnel found the Emdeon name appealing. A trademark clearance search was performed and plaintiff's M.D. ON-LINE mark was not reported.

Plaintiff responds that WebMD acted in bad faith when it adopted the emdeon mark because it knew of plaintiff's M.D. ON-LINE mark.  However, "mere knowledge of the existence of a competitor's mark is insufficient to prove bad faith." *NEC Elecs., Inc. v. New England Circuit Sales, Inc.*, 722 F. Supp. 861, 866 (D. Mass. 1989) (citing *Ziebart Int'l Corp. v.*

*After Market Associates, Inc.*, 802 F.2d 220, 227 (7th Cir. 1986)).  Thus, given the undisputed

history, the fact that WebMD had knowledge of plaintiff's mark is insufficient evidence to

support a finding of bad faith.

Moreover, the Court seriously questions plaintiff's underlying premise that WebMD

would seek to adopt a mark confusingly similar to M.D. ON-LINE.  Although M.D. On-Line as a

company may have established good will and a positive reputation in its business, it only

operates within a very small niche of the healthcare industry.  Defendants, however, provide

services and products that extend far beyond that small niche, canvassing the healthcare industry.

In fact, defendants derive approximately 99% of their revenue from businesses that do not

compete with plaintiff.  It would appear, without more, to strain credulity that defendants would

hope to, or even could, trade off of plaintiff's niche good will in such a wide range of unrelated

businesses.  Thus, plaintiff has failed to proffer any evidence demonstrating that defendants

adopted the emdeon mark in bad faith.

Accordingly, this factor weighs in favor of defendants.


**7.      Whether Products Are Marketed Through the Same
         Channels of Trade and Advertised in the Same Media**

"[T]he greater the similarity in advertising and marketing campaigns, the greater the

likelihood of confusion."  *Checkpoint*, 269 F.3d at 288-89 (quoting *Acxiom Corp. v. Axiom, Inc.*,

27 F. Supp. 2d 478, 502 (D. Del. 1998)).  This inquiry requires the Court to examine the "media

the parties use in marketing their products as well as the manner in which the parties use their

sales forces to sell their products to consumers."  *Id.* at 289.

Defendants acknowledge that they use similar methods of marketing and advertising, but argue that they emphasize visual marketing techniques, e.g., via its website, whereas plaintiff emphasizes phonetic marketing, e.g., telemarketing.  (Defs.' Opp'n Br. at 23-24; Smith Cert. ¶ 33).  Although defendants' argument may diminish the weight given to this factor in the Court's analysis, the extent to which defendants use one form of marketing over another does not alter the fact that the parties use the same methods.  Defendants and plaintiff market their products and services through websites, resellers, trade shows, direct mail, provider referrals and telemarketing.  (*See* Smith Cert. ¶ 33; Bartzak Cert. ¶¶ 17-19).  Consequently, this factor favors plaintiff.

**8.     Extent to which Targets of the Parties' Sales Efforts Are the Same**

The targets of the parties' sales efforts are the same to the extent the focus is limited to selling electronic claims processing software.  Both parties target the same consumers – office managers or billing administrators.  *See* Factor 3 discussed above.  Accordingly, this factor favors plaintiff.

**9.     Relationship of the Goods**

"The closer the relationship between the products, . . . the greater the likelihood of confusion."  *Lapp*, 721 F.2d at 462.  The relevant question is – how closely related are the products?  *Kos Pharms.*, 369 F.3d at 722-23.  This question seeks to determine "whether it would be reasonable for consumers to associate [the products] or see them as related."  *Id.*

18

Here, the products are of the same type and function similarly.  They enable the electronic processing of healthcare claims.  Any differences in functionality – the speed with which plaintiff's consumers may begin using its software or the number of options defendants' software provides – do not detract from their overall similarity.  *See Kos Pharms.*, 269 F.3d at 723 ("The question is not whether it is possible to distinguish between the products but whether, and to what extent, the products seem related, 'whether because of [their] near-identity, . . . or similarity of function, or other factors.'") (quoting *A & H*, 237 F.3d at 215).  Accordingly, this factor favors plaintiff.

### 10.    Other Facts Suggesting the Public Might Expect the Prior Owner to Manufacture Both Products

This factor allows courts to consider "the nature of the products or the relevant market, the practices of the other companies in the relevant fields, or any other circumstances that bear on whether consumers might reasonably expect both products to have the same source."  *Kos Pharms.*, 369 F.3d at 724.

Unlike in *Kos Pharmaceuticals*, where consumers could expect the maker of one drug to make the other because it was complimentary and could be viewed as a natural brand extension,[7] there is nothing in the record to suggest that consumers would expect Emdeon's software, which directly competes against plaintiff's, to be an extension of plaintiff's LINE products.  Indeed, although the parties sell their products under their respective marks, the products themselves have very distinct names.  Emdeon's product is called WebMD Office.  Plaintiff's products are

---

[7]*See Kos Pharms.*, 369 F.2d at 724.

19

called WebLINK, ClaimLink 1500 and WinLINK.  These different product names further distinguish the sources of the software and make it unlikely that consumers would believe that Emdeon's software is an extension of the LINK products.

In sum, the tenth factor favors defendants.


## II.     Weighing the *Lapp* Factors

This case essentially comes down to whether a mark that sounds arguably similar to another mark, but is otherwise distinguishable, should be enjoined from use.  In order to place this issue in context, it is necessary to take a step back in time when plaintiff's mark was M.D. ON-LINE and defendants' mark was WebMD.  Notably, if the *Lapp* factor analysis conducted above had been applied to these two marks, every factor would be supported by the same facts but for the first – similarity of the marks.  Under that factor, the marks would appear different, sound different, but have a similar meaning.  Apparently, when the WebMD mark was used, consumers were not confused.  But because defendants changed their mark to emdeon, which appears different, means something different, but arguably sounds similar, plaintiff argues that is sufficient to enjoin its use.  This Court disagrees.

Similarity of the marks – the most important factor – weighs in favor of defendants.  As articulated above, the marks appear different, mean something different, and sound different.  Further, consumers are sophisticated and exercise a heightened degree of care before purchasing the products at issue.  In addition, the defendants adopted the emdeon mark in good faith.  Taking these factors together, the Court finds they outweigh the factors favoring plaintiff.  The dissimilarity in the marks combined with consumer sophistication and care make it unlikely that

consumers will be confused even though the parties' products are marketed through the same channels of trade, are targeted at the same consumers, and function similarly.  These products are used over the internet.  Any marketing done by the parties would, of necessity, direct consumers to the appropriate website.  As a result, the sophisticated consumers will be able to readily and easily distinguish between the parties' products.  The plaintiff's weak-to-moderate strength in its mark does not alter this conclusion.

Accordingly, because a balance of the factors tips heavily in favor of defendants, the Court finds that plaintiff has not demonstrated that it has a reasonable likelihood of success of demonstrating there exists a likelihood of confusion.

**III.    Irreparable Harm / Balancing of Equities / Public Interest**

Since there is no reasonable likelihood of success on the merits, there can be no irreparable harm.  *See Cumberland Packing Corp. v. Monsanto Co.*, 32 F. Supp. 2d 561, 580 (E.D.N.Y. 1999); *Microwave Sys. Corp. v. Apple Computer, Inc.*, 126 F. Supp. 2d 1207, 1218 (S.D. Iowa 2000).  As a result, the final two preliminary injunction factors favor defendants as well.  Clearly, absent a showing of likelihood of confusion and irreparable harm, the balancing of the equities and public interest require that plaintiff's motion be denied.

**CONCLUSION**

For the aforesaid reasons, plaintiff's motion for preliminary injunction is denied.


**Dated:**  October 6, 2005                    s/ William J. Martini
                                              **William J. Martini, U.S.D.J.**